UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES GARDNER | ) | |
| | ) | |
| individually and on behalf | ) | |
| of all others similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 15-cv-12320-RWZ |
| | ) | |
| v. | ) | |
| | ) | |
| DRAFTKINGS, INC., a Delaware corporation, | ) | Class Action |
| | ) | |
| Defendant. | ) | |

## **FIRST AMENDED CLASS ACTION COMPLAINT**

Respectfully submitted by,

By:  ___/s/ Kenneth J. DeMoura_____
      Kenneth J. DeMoura
      BBO#: 548910
      DEMOURA|SMITH LLP
      One International Place, 14th Floor
      Boston, MA 02110
      Office: 617.535.7531
      kdemoura@demourasmith.com

and

By:  _/s/ Emily Lisa Perini___
      Emily Lisa Perini
      BBO #: 684103
      PERINI-HEGARTY & ASSOCIATES, P.C.
      225 Franklin Street, 26th Floor
      Boston, MA 02110
      617.217.2832
      elp@perinihegartypc.com
      *Attorneys for Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

THE PARTIES ........................................................................................................... 1

    Massachusetts Plaintiff ........................................................................................ 1

    DraftKings .............................................................................................................. 1

JURISDICTION AND VENUE ................................................................................. 2

FACTUAL ALLEGATIONS REGARDING DEFENDANTS' LIABILITY ............................. 2

    The Unethical Nature of DraftKings' Practices .................................................. 14

    DraftKings' Violations of the Law ..................................................................... 22

CLASS ACTION ALLEGATIONS: ......................................................................... 22

COUNT I:  BREACH OF CONTRACT ..................................................................... 24

COUNT II:  COMMON LAW FRAUD...................................................................... 25

COUNT III:  UNJUST ENRICHMENT ..................................................................... 26

COUNT IV:  MONEY HAD AND RECEIVED......................................................... 26

COUNT V:  DECEPTIVE PRACTICES IN VIOLATION OF STATE CONSUMER
PROTECTION STATUTES........................................................................................ 27

COUNT VI:  UNFAIR/DECEPTIVE PRACTICES IN VIOLATION OF STATE CONSUMER
PROTECTION STATUTES........................................................................................ 31

COUNT VII:  DECLARATORY RELIEF REGARDING DEFENDANT'S SO-CALLED
"TERMS OF USE"..................................................................................................... 34

JURY TRIAL DEMAND ........................................................................................... 37

PRAYER FOR RELIEF .............................................................................................. 37

The plaintiff, JAMES GARDNER ("Plaintiff"), on behalf of himself and all members of the putative Class set forth below, and for their Amended Complaint against Defendant DraftKings, Inc. ("DraftKings" or "Defendant"), allege as follows based on personal knowledge as to their actions and on information and belief as to Defendant's conduct and practices:

## INTRODUCTION

1.      Plaintiff brings this class action individually and on behalf of a Class of persons and entities (referred to herein collectively as "Class Members," or "Class") to recover amounts of money that he and the members of the Class did not receive from DraftKings despite DraftKings' representations that plaintiffs' initial payments would be doubled as a "free bonus"; representations that were deceptive, unfair and unethical.

## THE PARTIES

### Massachusetts Plaintiff

2.      Plaintiff James Gardner is a resident of Brockton, Massachusetts.  Mr. Gardner on or about April 6, 2015 made an initial deposit of $10.00 on the DraftKings website, www.draftkings.com, after receiving a promise from DraftKings that he would receive a "100% First-Time Deposit Bonus." Despite that promise he did not receive the entirety of the bonus.

### DraftKings

3.      DraftKings, Inc. is a business that offers paid fantasy sports contests for cash prizes for residents of 45 states and the District of Columbia.

4.      DraftKings is incorporated under the laws of Delaware, with its principal place of business at 125 Summer St., 5th Floor, Boston, Massachusetts 02110.

5.      From computers and other devices, consumers in Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,

Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming access DraftKings' Internet site, pay money, and engage in paid fantasy sports competitions with other contestants for cash prizes in an array of contests.

6.      DraftKings advertises its services nationally both on television and radio and over the Internet.

## JURISDICTION AND VENUE

7.      This is a class action filed under Rule 23 of the Federal Rules of Civil Procedure.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), which under the provisions of the Class Action Fairness Act explicitly provides for the original jurisdiction in the federal courts of any class action in which any member of the Plaintiff class is a citizen of a State different from any Defendant, and in which the matter in controversy exceeds the aggregate sum of $5,000,000, exclusive of interest and costs, unless the number of members of all proposed Plaintiff classes in the aggregate is less than 100.

9.      Plaintiff is a citizen of Massachusetts.  The class consists of citizens of various states.  Defendant is a citizen of Delaware and Massachusetts, as set forth above.  Therefore, diversity of citizenship exists pursuant to 28 U.S.C. § 1332(d)(2)(A).

10.      The total claims of the individual Class Members are in excess of $5,000,000 in the aggregate, exclusive of interest and costs.

11.      The number of members of the Plaintiff Classes is at least 100.

12.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS REGARDING DEFENDANTS' LIABILITY

13.     Daily paid fantasy sports contests for cash prizes over the internet have grown in a mere three years from non-existence into a multi-billion dollar industry.  Riding the wave of popularity, DraftKings has emerged as the No. 2 player in the field, solidifying its market share by buying the No. 3 and No. 4 daily fantasy sites in blockbuster 2014 deals.

14.     DraftKings offers contests in a wide variety of sports, including professional football, major league baseball, professional basketball and hockey, college football and basketball, golf, horse racing and even mixed martial arts, poker tournaments and English soccer.

15.     DraftKings' business is a legal one under United States law.  In the Unlawful Internet Gambling Enforcement Act of 2006, Congress deemed fantasy sports a game of skill, not of chance, thereby legitimizing paid online fantasy sports contests for cash.  *See* 31 U.S.C. § 5362(1)(E)(ix).  DraftKings states on its website:  "We take the legal status of our contests very seriously."[1]

16.     DraftKings generates its revenue by hosting competitions among individual users nationwide and, for its services, taking a portion of the earnings that can range up to 10%.  As an example, using a 10% take, in a competition in which 10 players pay $10 each for a total of $100 in a winner-takes-all format, the winner will receive $90, with DraftKings taking $10.

17.     Utilizing this model, DraftKings awarded a total of $200 million in prizes in 2014, according to an article in the New York Business Journal.[2]  That same article reported that DraftKings had "about 1 million" registered users and 200,000 monthly active users in September-October 2014.

---

[1] https://www.draftkings.com/help/faq (accessed 4/21/2015).
[2] B. Fischer, FanDuel vs. DraftKings:  Are we seeing the future of sports wagering?, http://www.bizjournals.com/ newyork/blog/techflash/2014/11/fanduel-vs-draftkings-are-we-seeing-the-future-of.html?page=all (accessed 4/21/2015).

18.     According to the Washington Post, by March 2015, the number of DraftKings registered users had grown to 2 million.[3]

19.     DraftKings has become so popular that major sports leagues, teams, and events have entered into promotional partnerships with it.  These include, among others, Major League Baseball ("MLB") and three MLB teams, the National Hockey League ("NHL") and seven NHL teams, the New England Patriots, the Pittsburgh Steelers, the Breeders Cup, and the World Series of Poker.  In April 2015, Draft Kings announced that it had entered into an agreement with MLB to become MLB's "Official Daily Fantasy Game."[4]

20.     The contests vary by sport and format, but in a typical contest, consumers pay up to thousands of dollars to compete against other participants in hopes that they will field the best fantasy "team."  Consumers, bound by a fictitious salary cap to "draft" their team, but spending real money to participate, select a roster of players they believe will perform well in individual statistics.

21.     To lure consumers, DraftKings engages in heavy advertising on television, particularly commercials during sporting events.  The New York Business Journal article quoted above reported that during the 2014 football season DraftKings ran 1,782 television spots on ESPN and other sports stations just through October 8.

22.     One DraftKings' commercial stated:  "DraftKings combines one-day fantasy sports with winning life-changing amounts of cash."

---

[3] A. Kilgore, Daily fantasy sports Web sites find riches in Internet gaming law loophole, http://www.washingtonpost.com/sports/daily-fantasy-sports-web-sites-find-riches-in-internet-gaming-lawloophole/2015/03/27/92988444-d172-11e4-a62f-ee745911a4ff_story.html (accessed 4/21/2015).
[4] DraftKings Becomes the Official Daily Fantasy Game of Major League Baseball:  Marks the Most Comprehensive League Partnership in Daily Fantasy Sports History, http://www.businesswire.com/news/home/20150402006154/en/DraftKings-Official-Daily-Fantasy-Game-Major-League#.VR7qivnF-So (accessed 4/21/2015).

23.     Another ad told the story of DraftKings' consumer Derek Bradley, a former accountant: "DraftKings' one-day fantasy baseball took him from a guy with holes in his underpants," the announcer stated, "to a guy with bikini models in them!"[5] That commercial also promised that if one signed up for DraftKings, the site would "double your deposit."

24.     Another way in which DraftKings advertises is with emails sent directly to potential consumers.  For example, on March 6, 2015, DraftKings placed an ad in an email sent to users of the sports website "Baseball Prospectus."  That ad stated:  "With your BP Subscription and First Deposit at DraftKings you get: Up to $600 Free on Your First Deposit." Ex. A hereto.

25.     DraftKings also advertises across the internet.  As part of this advertising scheme, DraftKings represents that up to $600 of a user's initial payment will be immediately matched by the site, for example that if they deposit a payment of $100, consumers will immediately have $200 with which to enter DraftKings' contests.

26.     Thus, on a DraftKings Internet video advertisement[6] touting the superiority of DraftKings over its competitor FanDuel.com and other sites, the announcer states:

> If you go through the link below, www.draftkingsdeal.com, you're going to double your first deposit, up to six-hundred dollars!  That means that if you put in one-hundred bucks, you get two hundred to play with. Put in three hundred, and get six hundred.  Put in six hundred, and get twelve hundred.  No other site can offer you this.

27.     In case the viewer missed the audio, the web page containing the above advertisement states:

> http.www.draftkingsdeal.com  Go through that link to get the BEST DraftKings deal anywhere online!  DOUBLE your first deposit up to $600 …

---

[5] *See* https://genderandsociety2013.wordpress.com/2013/09/20/are-you-ready-for-some-objectification/ (accessed 4/21/2015).

[6] https://www.youtube.com/watch?v=0Ozm3Mi-rPA (accessed 4/21/2015).

28.     Clicking on the link brings the consumer to a page on DraftKings' website[7] that states: "Plus, deposit now and we'll double your cash!"  Here is a screen shot of that page as it appeared on April 21, 2015:



29.     That same page appears if consumers go directly to www.draftkings.com.

30.     DraftKings' website also contains a "contest-lobby page."[8]  As of April 21, 2015, that page displayed the following (the full page is attached as Ex. B):



31.     Upon clicking on the "CLAIM FREE OFFER" link from the above pages, consumers are routed to a registration page.  After choosing a username and password and

---

[7] https://www.draftkings.com/?aff_sub=78319&s=220267522&aff_oid=126 (accessed 4/21/2015).
[8] https://www.draftkings.com/contest-lobby (accessed 4/21/2015).

providing their email address, state of residence and confirmation that they are at least 18 years

of age, consumers are directed to click on a heading entitled "Register."

32.     The "Register" heading is a link taking new registrants to the "Deposit" page,

where they are immediately put on notice that they need to deposit their cash quickly, lest they

lose the 100-Percent First-Time Deposit Bonus.  A large, prominently displayed count-down

clock starts at 10:00 minutes and ticks down the seconds.  Adjacent to the clock, the site states:

## Claim your FREE Entry!

Congratulations! As our newest customer with your first deposit, you will receive a **FREE Entry** ($2 value) to play in a paid contest. PLUS, deposit now and we'll **DOUBLE YOUR CASH**, up to $600*! Get started now!  [Bold face and capitalized emphasis in original.]

33.     Directly below the clock are five large text boxes, allowing consumers to choose from the

following deposit amounts and receive the corresponding "free bonuses":  "[1] $25:  $25 Free

Bonus; [2] $100:  $100 Free Bonus; [3] $250:  $250 Free Bonus; [4] $600:  $600 Free Bonus"

and [5] "Other," providing a matching bonus up to $600.  A print-out of that page is attached as

Ex. C.

34.     Here is a screenshot of this page as it appeared on April 21, 2105:



35.    As can be seen from the above, there is an asterisk after "**DOUBLE YOUR CASH**, up to $600."  Only by scrolling to the bottom of the page can one find the corresponding footnote, which contains the following disclaimer:  "*Deposit bonus funds are not available immediately, but are released into your cash account in increments of $1 for every 100 Frequent Player Points (FPPs) that you earn by playing paid contests.  You can always view your current deposit bonus information on the My Account page.  For more information about deposit bonuses, please click here."  Here is a screen shot of that footnote in a size that is roughly proportional to its appearance in relationship to the screen shot above from the same page:

8

*Deposit bonus funds are not available immediately, but are released into your cash account in increments of $1 for every 100 Frequent Player Points (FPPs) that you earn by playing paid contests. You can always view your current deposit bonus information on the My Account page. For more information about deposit bonuses, please click here.

36.     This footnote does not explain what "Frequent Player Points" are or how they are to be "earned" in paid contests.  Nor does it state that, without depositing (or winning) additional money and spending that money on additional contests, the consumer will never receive the so called "100% First-Time Deposit Bonus" or "DOUBLE YOUR CASH" bonus.  Nowhere does it indicate how much of the bonus the consumer will receive after making his or her initial deposit.

37.     The "click here" link in the footnote that purports to provide more information about deposit bonuses takes the registrant to a page of "Frequently Asked Questions" that, when it first appears, contains eight categories without questions.[9]  The page as it appears after the link is clicked is reproduced below:

---

[9] https://www.draftkings.com/help/faq (accessed 4/21/2015).



38.     Clicking on the categories reveals more than an aggregate of 50 separate questions.  One of those categories is, "Deposits, Withdrawals & Bonuses."  On clicking on that category, eight questions appear.  That list of questions, as it appears on the page, is reproduced below:



39.     As can be seen, the sixth question is, "How Do I Get My Deposit Bonus?"

Assuming the consumer finds that question and clicks on it, he or she is displayed the following

disclaimer:  "Deposit bonuses release in increments of $1 for every 100 Frequent Player Points

(FPPs) that you earn by playing in paid contests.  All deposit bonuses expire four months after

they are created.  If you have an issue with your deposit bonus expiring, please contact

support@draftkings.com."  This question and its response, as they appear on the page, are

reproduced below:



40.     As with the footnote described above, this answer does not explain what

"Frequent Player Points" are or how they are "earned" and does not state that, without

depositing (or winning) additional money and spending that money on additional contests, the

consumer will never receive the full "bonus."  Nor does it indicate how much of the bonus the

consumer will receive upon paying his or her initial deposit.  Aside from all that, the answer also

does not clearly state what is meant by "deposit bonuses expire four months after they are

created."  It does not mean that the consumer has four months to use the bonus in additional

contests; instead it means that the consumer has four months to obtain the bonus by spending

additional money on contests.

41.     The next question on the FAQ list is, "What is a Frequent Player Point?"

Clicking on that question reveal the following:  "Frequent Player Points (FPPs) are points you

earn upon the start of every paid contest you enter on DraftKings.com, whether you win or lose. FPPs awarded vary per contest type (displayed on the Draft page) and are not earned for playing in FREE ENTRY games. The more contests you join and money you spend, the more FPPs you earn."

42.     Nowhere does this answer explain how FPPs relate to receiving the purported "100% First-Time Deposit Bonus" or "**DOUBLE YOUR CASH**" bonus.  Nor does it state how much a consumer must spend to earn a given number of FPPs.

43.     Back on the selection page, after making a selection of deposit amount and entering payment information, the consumer is directed to a deposit confirmation page where he or she can make a deposit of money.

44.     After making his or her deposit and receiving deposit confirmation, the consumer learns that the "100% First-Time Deposit Bonus" and "**DOUBLE YOUR CASH**" bonus is in fact nothing of the sort and that his or her payment did not double.

45.     Indeed, consumers receive *no money* upon depositing.  They discover, instead, that they are required to incur additional and substantial monetary obligations to obtain the "bonus" and that they will never "**DOUBLE [THEIR] CASH**."

46.     Specifically, to receive their so-called "bonus," consumers have to pay to enter contests and then receive only a small amount, *four percent or less* of every dollar they spend within four months, until those small returns total the initial deposit or the four months expire. For games with small entry fees, such as $5, the return is four percent.  For games with larger fees, the return can be less.  However, not until the user has actually paid his or her initial deposit, is he or she ever told that the actual "bonus" paid with that deposit would be only four percent or less of the deposit.

13

47.     For example, Plaintiff James Gardner made an initial deposit of $10.00.  He did not, as promised, receive an additional $10.00 to double his cash so that he would have $20.00 with which to enter the contests.

48.     Instead, when Plaintiff spent his initial deposits on fantasy contests, he received a "bonus" of only four percent of the initial payments.

49.     Consumers actually would have to pay and spend 25 times their initial payments or more in order to receive the promised "100% First-Time Deposit Bonus" or "**DOUBLE YOUR CASH**" bonus.

50.     For example, for Plaintiff James Gardner to obtain a $10.00 bonus, he would have had to spend a total of $250.00 or more on DraftKings' contests within four months, or $240.00 more than his initial payment.

51.     At the high end, a consumer who had deposited $600 would have to spend at least $15,000 on contests, and do so within four months, to obtain what was promised as a "100% First-Time Deposit Bonus" or "**DOUBLE YOUR CASH**" bonus of $600; that would be $14,400 more than his or her initial payment.

## The Unethical Nature of DraftKings' Practices

52.     The above advertising claims are unfair and deceptive and violate generally accepted principles of ethical business conduct for the following reasons:

- The large-type representations of the offer of a "Free Bonus," "Free Offer," "100% First-Time Deposit Bonus" and "**DOUBLE YOUR CASH**" bonus do not contain simple and consistent statements or representations of all the essential points of the offer, and the overall impression of the "bonus" offer is contradicted by the small-print disclaimers in the footnote and on the "FAQ" page.

- The representations in the footnote and on the "FAQ" page are by their size, placement, and other characteristics unlikely to be noticed and difficult to understand even though they are material to the offer.

14

- The representations of a "100% First-Time Deposit Bonus" and **DOUBLE YOUR CASH**" bonus are similar to "free," "2-for-1," or "half-price" representations but have qualifications and conditions that are not clearly and conspicuously disclosed in close conjunction with the representations. Moreover, to obtain the "100% First-Time Deposit Bonus" or doubling of cash the consumer must pay a higher price than represented.

53.     The ethical principles that DraftKings violated as set forth in the above bullet points are established in, among other sources, the ethical guidelines of the Direct Marketing Association ("DMA"), the leading industry association for companies that, like Defendant, market directly to consumers. DMA has set forth principles of ethical business practices for such marketing activities, whether engaged in by DMA members or other businesses that market to consumers. *Direct Marketing Association's Guidelines for Ethical Business Practices*, revised May 2011. ("DMA Ethical Guidelines")  (Ex. D); DMA Ethical Guidelines, revised January 2014 (Ex. E).

54.     The DMA Ethical Guidelines "are intended to provide individuals and organizations involved in direct marketing in all media with generally accepted principles of conduct." *Id.* at 2.  They are based on DMA's "long-standing policy of high levels of ethics and the responsibility of the Association, its members, and *all marketers* to maintain consumer and community relationships that are based on fair and ethical principles." *Id.* (emphasis added).

55.     In addition, the Ethical Guidelines "are intended to be honored in light of their aims and principles.  All marketers should support the guidelines in spirit and not treat their provisions as obstacles to be circumvented by legal ingenuity." *Id*.

56.     Defendant's practices specifically violate Articles 1, 2 and 17 of the DMA Ethical Guidelines and its companion volume, *Do the Right Thing:  A Companion to DMA's Guidelines for Ethical Business Practice* (Revised January 2009) ("*Do the Right Thing*").  *Do the Right*

*Thing* is intended to "give[] direct marketers advice on how to assure their business practices

comply with" the Ethical Guidelines (Ex. F) .

57.     Articles 1, 2 and 17 of the DMA Ethical Guidelines state as follows:

**HONESTY AND CLARITY OF OFFER**
                              <u>**Article #1**</u>

All offers should be clear, honest, and complete so that the consumer may know the exact
nature of what is being offered, the price, the terms of payment (including all extra
charges) and the commitment involved in the placing of an order. Before publication of
an offer, marketers should be prepared to substantiate any claims or offers made.
Advertisements or specific claims that are untrue, misleading, deceptive, or fraudulent
should not be used.

**ACCURACY AND CONSISTENCY**
                              <u>**Article #2**</u>

Simple and consistent statements or representations of all the essential points of the offer
should appear in the promotional material. The overall impression of an offer should not
be contradicted by individual statements, representations, or disclaimers.

**USE OF THE WORD "FREE" AND OTHER SIMILAR REPRESENTATIONS**
                              <u>**Article #17**</u>

A product or service that is offered without cost or obligation to the recipient may be
unqualifiedly described as "free."

If a product or service is offered as "free," all qualifications and conditions should be
clearly and conspicuously disclosed, in close conjunction with the use of the term "free"
or other similar phrase. When the term "free" or other similar representations are made
(for example, 2-for-1, half-price, or 1-cent offers), the product or service required to be
purchased should not have been increased in price or decreased in quality or quantity.

58.     DraftKings' practices also violate the DMA's companion volume *Do the Right*

*Thing.*  Under Article 2, DMA states:  "Keep in mind that a disclaimer or disclosure alone

usually is not enough to remedy a misleading or false claim. … [Y]ou should make sure that the

details [of the promotion] will be noticed by the average consumer and that they do not merely

explain away the promotion's overall impression."  *Do the Right Thing* at 8.

59.     Under Article 17, *Do the Right Thing* explains:

16

If [consumers] respond to a "free" offer in which additional items need to be purchased, … they should be clearly informed of the terms and conditions in the initial promotion before they are billed so there are no misunderstandings. Clear disclosures explaining the offer should appear near a representation that something is "free," before you can be fairly confident that average consumers will understand the offer.

### DraftKing's So-Called Terms of Use

60.     DraftKings purports to bind consumers to certain "Terms of Use."  Those so-called "Terms of Use" are set forth on a long web page containing a maze of fine print that consists of nearly 6,000 words in single-spaced tiny print.  (A print-out of the "Terms of Use" as they appeared on the website on April 21, 2015, is attached as Ex. G.)

61.     To show how difficult it is to read this page, the section entitled, "LIMITATION OF LIABILITY," as it appeared on April 21, 2015, is reproduced in the screenshot below:

**LIMITATION OF LIABILITY**

YOU UNDERSTAND AND AGREE THAT THE COMPANY LIMITS ITS LIABILITY IN CONNECTION WITH YOUR USE OF THE WEBSITE AS SET FORTH BELOW: UNDER NO CIRCUMSTANCES SHALL THE COMPANY, ITS PARENTS, SUBSIDIARIES, OR AFFILIATES, OR THE DIRECTORS, OFFICERS, EMPLOYEES, OR OTHER REPRESENTATIVES OF EACH OF THEM (COLLECTIVELY, THE "COMPANY ENTITIES AND INDIVIDUALS"), BE LIABLE TO YOU FOR ANY LOSS OR DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION, FOR ANY SPECIAL, DIRECT, INDIRECT, INCIDENTAL, EXEMPLARY, ECONOMIC, PUNITIVE, OR CONSEQUENTIAL DAMAGES) THAT ARE DIRECTLY OR INDIRECTLY RELATED TO (1) THE WEBSITE, THE CONTENT, OR YOUR UPLOAD INFORMATION; (2) THE USE OF, INABILITY TO USE, OR PERFORMANCE OF THE WEBSITE; (3) ANY ACTION TAKEN IN CONNECTION WITH AN INVESTIGATION BY THE COMPANY OR LAW ENFORCEMENT AUTHORITIES REGARDING YOUR USE OF THE WEBSITE OR CONTENT;(4) ANY ACTION TAKEN IN CONNECTION WITH COPYRIGHT OWNERS; OR (5) ANY ERRORS OR OMISSIONS IN THE WEBSITE'S TECHNICAL OPERATION, EVEN IF FORESEEABLE OR EVEN IF THE COMPANY ENTITIES AND INDIVIDUALS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES WHETHER IN AN ACTION OF CONTRACT, NEGLIGENCE, STRICT LIABILITY TORT (INCLUDING, WITHOUT LIMITATION, WHETHER CAUSED IN WHOLE OR IN PART BY NEGLIGENCE, ACTS OF GOD, TELECOMMUNICATIONS FAILURE, OR THEFT OR DESTRUCTION OF THE WEBSITE). IN NO EVENT WILL THE COMPANY ENTITIES AND INDIVIDUALS BE LIABLE TO YOU OR ANYONE ELSE FOR LOSS OR INJURY, INCLUDING, WITHOUT LIMITATION, DEATH OR PERSONAL INJURY. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU. IN NO EVENT SHALL THE COMPANY ENTITIES AND INDIVIDUALS TOTAL LIABILITY TO YOU FOR ALL DAMAGES, LOSSES, OR CAUSES OF ACTION EXCEED ONE HUNDRED DOLLARS ($100). THE COMPANY ENTITIES AND INDIVIDUALS ARE NOT RESPONSIBLE FOR ANY DAMAGE TO ANY USER'S COMPUTER, HARDWARE, COMPUTER SOFTWARE, OR OTHER EQUIPMENT OR TECHNOLOGY INCLUDING, WITHOUT LIMITATION, DAMAGE FROM ANY SECURITY BREACH OR FROM ANY VIRUS, BUGS, TAMPERING, FRAUD, ERROR, OMISSION, INTERRUPTION, DEFECT, DELAY IN OPERATION OR TRANSMISSION, COMPUTER LINE OR NETWORK FAILURE OR ANY OTHER TECHNICAL OR OTHER MALFUNCTION. YOUR ACCESS TO AND USE OF THIS WEBSITE IS AT YOUR RISK. IF YOU ARE DISSATISFIED WITH THE WEBSITE OR ANY OF THE CONTENT, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE ACCESSING AND USING THE WEBSITE OR THE CONTENT. YOU RECOGNIZE AND CONFIRM THAT IN THE EVENT YOU INCUR ANY DAMAGES, LOSSES OR INJURIES THAT ARISE OUT OF THE COMPANY'S ACTS OR OMISSIONS, THE DAMAGES, IF ANY, CAUSED TO YOU ARE NOT IRREPARABLE OR SUFFICIENT TO ENTITLE YOU TO AN INJUNCTION PREVENTING ANY EXPLOITATION OF ANY WEBSITE OR OTHER PROPERTY OWNED OR CONTROLLED BY THE COMPANY AND/OR ITS PARENTS, SUBSIDIARIES, AND/OR AFFILIATES OR YOUR UPLOAD INFORMATION, AND YOU WILL HAVE NO RIGHTS TO ENJOIN OR RESTRAIN THE DEVELOPMENT, PRODUCTION, DISTRIBUTION, ADVERTISING, EXHIBITION OR EXPLOITATION OF ANY COMPANY WEBSITE OR OTHER PROPERTY OR YOUR UPLOAD INFORMATION OR ANY AND ALL ACTIVITIES OR ACTIONS RELATED THERETO. BY ACCESSING THE WEBSITE, YOU UNDERSTAND THAT YOU MAY BE WAIVING RIGHTS WITH RESPECT TO CLAIMS THAT ARE AT THIS TIME UNKNOWN OR UNSUSPECTED. ACCORDINGLY, YOU AGREE TO WAIVE THE BENEFIT OF ANY LAW, INCLUDING, TO THE EXTENT APPLICABLE, CALIFORNIA CIVIL CODE SECTION 1542, THAT OTHERWISE MIGHT LIMIT YOUR WAIVER OF SUCH CLAIMS.

62.     The first substantive paragraph of the so-called "Terms of Use" purports to provide that the "Terms of Use," DraftKings' "Privacy Policy" and the Rules of the contests constitute "the 'Agreement.'"  The second paragraph goes even further by asserting, notwithstanding the Privacy Policy and Rules, that "[t]hese Terms of Use constitute a legal

agreement between you and DraftKings, and shall apply to your use of the Website and the

Services even after termination."

63.     The so-called "Terms of Use" do not constitute a valid, mutual agreement because

the promises made by DraftKings are illusory.  Indeed, there is no restriction on DraftKings'

ability to terminate the "agreement" or to refuse to perform.

64.     For example, the so-called "Terms of Use" provide that DraftKings and related

individuals such as officers and directors are released from any liability for any claim by the user

"whatsoever":

> By entering into a Contest or accepting any prize, entrants, including but not
> limited to the winner(s), agree to indemnify, release and to hold harmless
> DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers,
> directors, employees, shareholders and representatives of any of the foregoing
> entities (collectively, the "Released Parties"), from any and all liability, claims or
> actions of any kind whatsoever, including but not limited to … [examples of
> various types of liability listed].

65.     This purported release from any and all liability whatsoever is reproduced below

as it appeared on the "Terms of Use" page on April 21, 2015 (see paragraph beginning "By

entering"):

Users further acknowledge that the forfeiture and/or return of any prize shall in no way prevent DraftKings from pursuing criminal or civil proceedings in connection with such conduct.

By entering into a Contest or accepting any prize, entrants, including but not limited to the winner(s), agree to indemnify, release and to hold harmless DraftKings, its parents, subsidiaries, affiliates and agents, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities (collectively, the "Released Parties"), from any and all liability, claims or actions of any kind whatsoever, including but not limited to injuries, damages, or losses to persons and property which may be sustained in connection with participation in the Contest, the receipt, ownership, use or misuse of any prize or while preparing for, participating in and/or travelling to or from any prize related activity, as well as any claims based on publicity rights, defamation, or invasion of privacy. DraftKings may, in its sole and absolute discretion, require an Authorized Account Holder to execute a separate release of claims similar to the one listed above in this Paragraph as a condition of being awarded any prize or receiving any payout.

DraftKings is not responsible for: any incorrect, invalid or inaccurate entry information; human errors; postal delays/postage due mail; technical malfunctions; failures, including public utility or telephone outages; omissions, interruptions, deletions or defects of any telephone system or network, computer online systems, data, computer equipment, servers, providers, or software (including, but not limited to software and operating systems that do not permit an entrant to participate in a Contest), including without limitation any injury or damage to any entrant's or any other person's computer or video equipment relating to or resulting from participation in a Contest; inability to access the Website, or any web pages that are part of or related to the Website; theft, tampering, destruction, or unauthorized access to, or alteration of, entries and/or images of any kind; data that is processed late or incorrectly or is incomplete or lost due to telephone, postal issues, computer or electronic malfunction or traffic congestion on telephone lines or transmission systems, or the Internet, or any service provider's facilities, or any phone site or website or for any other reason whatsoever; typographical, printing or other errors, or any combination thereof.

DraftKings is not responsible for incomplete, illegible, misdirected or stolen entries. If for any reason a Contest is not capable of running as originally planned, or if a Contest, computer application, or website associated therewith (or any portion thereof) becomes corrupted or does not allow the proper entry to a Contest in accordance with the Terms of Use or applicable Contest rules, or if infection by a computer (or similar) virus, bug, tampering, unauthorized intervention, actions by entrants, fraud, technical failures, or any other causes of any kind, in the sole opinion of DraftKings corrupts or affects the administration, security, fairness, integrity, or proper conduct of a Contest, the Company reserves the right, at its sole discretion, to disqualify any individual implicated in such action and/or to cancel, terminate, extend, modify or suspend the Contest, and select the winner(s) from all eligible entries received. If such cancellation, termination, modification or suspension occurs, notification will be posted on the Website.

ANY ATTEMPT BY AN ENTRANT OR ANY OTHER INDIVIDUAL TO DELIBERATELY DAMAGE THE WEBSITE OR UNDERMINE   Contact us!      ∧ ✕

66.     Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to Defendant the right to deny service to any user for any reason "whatsoever":  "DraftKings reserves the right, in its sole and absolute discretion, to deny any contestant the ability to participate in head-to-head contests for any reason whatsoever."  Thus, DraftKings is not bound to any performance obligation.

67.     Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give DraftKings the right, "without prior notice," to "revoke any or all of your rights granted hereunder."  Thus, once again, DraftKings is not bound to any performance obligation.  The portion of the so-called "Terms of Use" containing that provision, as it appeared on April 21, 2015, is reproduced in the screen shot below:

Any withdrawal requests, after approved by DraftKings, will be credited back to the same credit card or method of payment used to deposit funds on the Website. DraftKings will only release withdrawals to a different credit card or other payment method other than that which was used to make deposit(s) after the aggregate amount of such deposit (s) has already been released back to the credit card(s) or payment method(s) used for the deposit(s).

**TERMINATION AND EFFECT OF TERMINATION**

In addition to any other legal or equitable remedy, DraftKings may, without prior notice, immediately revoke any or all of your rights granted hereunder. In such event, you will immediately cease all access to and use of the DraftKings Website. DraftKings may revoke any password(s) and/or account identification issued to you and deny you access to and use of the Website. Any such action shall not affect any rights and obligations arising prior thereto. All provisions of the Terms of Use which by their nature should survive termination shall survive termination, including, without limitation, ownership provisions, warranty disclaimers, indemnity and limitations of liability.

**DISCLAIMER OF WARRANTIES**

THE WEBSITE, INCLUDING, WITHOUT LIMITATION, ALL CONTENT, SOFTWARE, AND FUNCTIONS MADE AVAILABLE ON OR ACCESSED THROUGH OR SENT

68.     Another reason why the promises made by DraftKings are illusory is that the so-called "Terms of Use" purport to reserve to DraftKings, and DraftKings alone, the right, without notice, to amend the terms of the alleged agreement between it and participants.  A provision near the bottom of the "Terms of Use" page states:  "DraftKings reserves the right to amend these Terms of Use at any time and without notice, and it is your responsibility to review these Terms of Use for any changes."

69.     Not only does the right given to DraftKings to amend the "Terms of Use" render it an illusory contract by itself, but DraftKings has made it virtually impossible for a user even to determine what was amended.  Although as shown in Ex. G, the "Terms of Use" page shows a

"Last Updated" date, it does not show what was updated on that date.  Considering the length and complexity of the purported "Terms of Use," it would be virtually impossible, if not actually impossible, for a user of the site to compare the current version of the purported "Terms of Use" with the most recent past version (which is not available on the DraftKings website) to figure out what was changed.

70.     Other provisions in the "Terms of Use" state that any claim or dispute arising out of the use of the DraftKings website must be resolved in an individual arbitration proceeding in Suffolk County, Massachusetts (see Ex. G,  p. 4 of 5), that it cannot be resolved in a class arbitration (*id.*); and that "[i]n the event that either party initiates a proceeding involving any Claim other than an arbitration in accordance with this Section, or initiates a proceeding involving a Claim under this Section other than in the Forum, the other party shall recover all attorneys' fees and expenses reasonably incurred in enforcing this Agreement to arbitrate and the Forum to which the parties have herein agreed."  *Id.*

71.     The section of the so-called "Terms of Use" containing these statements is hidden in a maze of text more than three-quarters of the way through the "Terms of Use."  As it appeared on DraftKings' website on April 21, 2015, it is reproduced in the screen shot below:

after a reasonable period of time required for the deletion to take full effect. However, the User Submission may still exist in our backup copies, which are not publicly available. If your User Submission is shared with third parties, those third parties may have retained copies of your User Submissions. In addition, if we made use of your User Submission before you deleted it, we will continue to have the right to make, duplicate, redistribute, and sublicense those pre-existing uses, even after you delete the User Submission. Terminating your account on a Service will not automatically delete your User Submissions.

We may refuse or remove a User Submission without notice to you. However, we have no obligation to monitor User Submissions, and you agree that neither we nor our parents, subsidiaries, affiliates, employees, or agents will be liable for User Submissions or any loss or damage resulting from User Submissions.

Except as provided in the Privacy Policy, we do not guarantee that User Submissions will be private, even if the User Submission is in a password-protected area. Accordingly, you should not provide User Submissions that you want protected from others.

You represent and warrant that you have all rights necessary to grant to DraftKings the license above and that none of your User Submissions are defamatory, violate any rights of third parties (including intellectual property rights or rights of publicity or privacy), or violate applicable law.

### ARBITRATION, CONSENT TO JURISDICTION IN MASSACHUSETTS, ATTORNEY'S FEES

Any and all disputes, claims or controversies arising out of or relating to this Agreement, the breach thereof, or any use of the Website (including all commercial transactions conducted through the Website) ("Claims"), except for claims filed in a small claims court that proceed on an individual (non-class, non-representative) basis, shall be settled by binding arbitration before a single arbitrator appointed by the American Arbitration Association ("AAA") in accordance with its then governing rules and procedures, including the Supplementary Procedures for Consumer-Related Disputes, where applicable. In agreeing to arbitrate all Claims, you and DraftKings waive all rights to a trial by jury in any action or proceeding involving any Claim. The arbitration shall be held in Suffolk County, Massachusetts, and judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. This arbitration undertaking is made pursuant to and in connection with a transaction involving interstate commerce, and shall be governed by and construed and interpreted in accordance with the Federal Arbitration Act at 9 U.S.C. Section 1, et seq. This arbitration provision shall survive termination of this Agreement. Subject to the limitations set forth below, the arbitrator shall have authority to award legal and equitable relief available in the courts of the Commonwealth of Massachusetts, provided that:

The arbitrator shall not have authority to award punitive damages; and

Any and all claims shall be arbitrated on an individual basis only, and shall not be consolidated or joined with or in any arbitration or other proceeding involving a Claim of any other party. You and DraftKings agree that the arbitrator shall have no authority to arbitrate any Claim as a class action or in any other form other than on an individual basis.

For any Claims that are not subject to arbitration: (a) the exclusive jurisdiction and venue for proceedings involving Claims shall be the courts of competent jurisdiction sitting within Suffolk County, Massachusetts (the "Forum"), and the parties hereby waive any argument that any such court does not have personal jurisdiction or that the Forum is not appropriate or convenient; (b) you and DraftKings waive any and all rights to trial by jury with respect to any Claims.

In the event that either party initiates a proceeding involving any Claim other than an arbitration in accordance with this Section, or initiates a proceeding involving a Claim under this Section other than in the Forum, the other party shall recover all attorneys' fees and expenses reasonably incurred in enforcing this Agreement to arbitrate and the Forum to which the parties have herein agreed.

### MISCELLANEOUS

These Terms of Use shall be governed by the internal substantive laws of the Commonwealth of Massachusetts, without respect to its conflict of laws principles. Any claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts.

Nothing in the Terms of Use shall create or confer any rights or other benefits in favor of any third parties except as specifically provided herein. By participating in any Contest on the Website, you agree to indemnify, protect, defend and hold harmless DK, its parents, subsidiaries, affiliates and divisions, and their respective directors, officers, employees, agents and representatives (the "DK Entities"), from and against any and all third party claims, liabilities, losses, damages, injuries, demands, actions, causes of action, suits, proceedings, judgments and expenses, including reasonable attorneys' fees, court costs and other legal expenses including, without limitation, those costs incurred at the trial and appellate levels and in any bankruptcy, reorganization, insolvency or other similar proceedings, and any other legal expenses (collectively, "Claims") arising from or connected with your use of the Website, any payment methods used, any funding of your account, and/or your participation in any Contest. The Website may contain links to third party websites that are not owned or controlled by DraftKings. DraftKings has no control over, and assumes no responsibility for, the content, privacy policies, or practices of any third party websites. In addition, DraftKings will not and cannot censor or edit the content of any third-party site. By using the Website, you

72.     Notwithstanding the above statements purporting to require that claims and disputes be decided in an arbitration proceeding, the so-called "Terms of Use" also purport to require that "[a]ny claim or dispute between you and DraftKings that arises in whole or in part from the Terms of Use, the Website or any Contest shall be decided exclusively by a court of competent jurisdiction located in Suffolk County, Massachusetts."  That sentence is contained in the portion of the so-called "Terms of Use" under "Miscellaneous" reproduced in the above paragraph.

73.     Although the arbitration provision purports to be mutual, it is not in fact mutual because the revocation provision described above gives DraftKings the exclusive right to revoke the arbitration provision.  Thus, DraftKings has not agreed to proceed against any user only in arbitration.  The same is true for the forum-selection and cost-shifting provisions described above.

74.     A consumer is not given the opportunity to negotiate the terms of the purported "Terms of Use."

## DraftKings' Violations of the Law

75.     The above advertising claims are deceptive in that they lead a reasonable consumer to believe that he or she will immediately receive and be able to use 100% of the initial deposit in DraftKings' games.

76.     As described more fully below, and as a result of the above-described actions, DraftKings is liable to Plaintiff and the Class on at least the following legal theories, individually or collectively: breach of contract, common law fraud, unjust enrichment, money had and received, and violations of state consumer protection statutes outlawing unfair and/or deceptive practices.

## CLASS ACTION ALLEGATIONS:

77.     Pursuant to Rule 23 of the Federal Rules of Procedure, Plaintiff seeks certification of the following class:

> All consumers who, in the States of Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Indiana, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming, deposited money into a DraftKings account after receiving the representation of a "Free Bonus," "FREE OFFER," "100%

First-Time Deposit Bonus," "**DOUBLE YOUR CASH**" Bonus and/or the like
and did not receive 100% of the initial deposit as promised

78.    Excluded from the proposed Class is Defendant, its Officers, Directors, and

employees, as well as employees of any subsidiary, affiliate, successors, or assignees of

Defendant.  Also excluded is any trial judge who may preside over this case.

79.    The Classes are believed to comprise many consumers, far more than 100, the

joinder of whom is impracticable, both because they are geographically dispersed across their

states and because of their number.

80.    Class treatment will provide substantial benefits to the parties and the Court.  A

well-defined commonality of interest in the questions of law and fact involved affect Plaintiff

and the putative Class Members.  Common questions of law and fact include:

      a.    Whether DraftKings made the representations set forth herein.

      b.    Whether DraftKings breached contracts it entered into with its users.

      c.    Whether DraftKings' practices alleged herein violated general accepted
         principles of ethical business practices.

      d.    Whether DraftKings' practices alleged herein were deceptive or unfair in
         violation of M.G.L. c. 93A § 2 and similar statutes of other states.

      e.    Whether DraftKings was unjustly enriched..

      f.    Whether consumers were injured thereby.

81.    Questions of law and fact common to members of the Classes, some of which are

set forth above, predominate over any questions affecting only individual members of the Class.

The resolution of common questions will resolve the claims of both Plaintiff and the Class.

82.    Plaintiff's claims are typical of the claims of his Class Members in that they

registered for DraftKings, paid a deposit and did not receive an immediate doubling.

83.     Plaintiff will fairly and adequately represent and protect the interests of the

proposed Class.  Plaintiff has no interests antagonistic to those of the Class.  Plaintiff has

retained competent and experienced counsel in the prosecution of this type of litigation.

84.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy because members of the Class are numerous and individual

joinder is impracticable.  The expenses and burden of individual litigation would make it

impracticable or impossible for proposed Class Members to prosecute their claims individually.

85.     This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23.

### COUNT I:  BREACH OF CONTRACT

86.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth

herein.

87.     DraftKings made numerous and repeated offers on its website, on the internet, in

emails, and in television advertisements that in exchange for class member making an initial

deposit, DraftKings would match that initial deposit up to $600.  Specifically DraftKings'

offered a "Free Bonus," "FREE OFFER," "100% First-Time Deposit Bonus," and "DOUBLE

YOUR CASH" Bonus to all class members who made an initial deposit with DraftKings.

88.     Class Members made the initial deposit, thus accepted those offers and entered

into a contract with DraftKings.

89.     By making the initial deposit, class members performed all of the conditions,

covenants and promises required by it in accordance with the terms and conditions of the

contract.

90.     Defendant breached their contract with class members by failing and refusing to

perform in good faith their promise to match class member's initial deposit up to $600.

## COUNT II:  COMMON LAW FRAUD

91.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

92.     DraftKings made numerous and repeated false statements of material fact on its website, in video advertisements, and in television advertisements.

93.     The most egregious of these false and misleading statements is reflected in DraftKings' promise to Plaintiff and the Class to "double [their] first deposit up to $600," clarifying, "[t]hat means that if you put in $100, you get $200 to play with."  On its website, DraftKings states that new depositors will "Receive a 100% First-Time Deposit Bonus" if they "CLAIM [their] FREE OFFER." DraftKings assured Plaintiff and the Class that it would "DOUBLE [THEIR] CASH" upon deposit.  It further promised Plaintiff and the Class that if they deposited $25, they would get a "$25 Free Bonus"; if they deposited $100, they would get a "$100 Free Bonus"; if they deposited $250, they would get a "$250 Free Bonus"; and if they deposited $600, they would get a "$600 Free Bonus."

94.     DraftKings had actual knowledge that these statements were false and misleading.

95.     Alternatively, DraftKings should have known that these statements were false and misleading and likely to induce consumers to deposit money where they may not otherwise do so.

96.     By disseminating these deceptive advertisements, DraftKings intended the representations contained therein to induce consumers to deposit money.  DraftKings had actual knowledge, or should have known, that its advertisements would lead consumers to expect a dollar-for-dollar deposit match.

97.     DraftKings' deceptive advertisements, and the Plaintiff's and the Class' subsequent reliance on said advertisements, proximately caused monetary and incidental damages to Plaintiff and the Class.

## COUNT III:  UNJUST ENRICHMENT

98.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

99.     As is more fully set forth above, Defendant engaged in unfair and deceptive acts or practices in connection with their representation of an initial deposit match of up to $600.

100.    As an intended and expected result of their conscious wrongdoing as set forth in this Amended Complaint, Defendant has profited and benefitted from deposits made by the Plaintiff and those similarly situated for the use of Defendant's services.

101.    Defendant has voluntarily accepted and retained these deposits with full knowledge and awareness that, as a result of their wrongdoing, Plaintiff and those similarly situated have deposited money under the pretense that their initial deposit would be doubled up to $600.

102.    As a direct result of this conduct and the deposits received for the use of their service, Defendants have been unjustly enriched.

103.    Plaintiff and those similarly situated are entitled in equity to seek restitution of Defendant's wrongful profits, revenues and benefits, to the extent and in the amount, deemed appropriate by the Court to remedy Defendants' unjust enrichment, and such other relief as the Court deems just and proper.

## COUNT IV:  MONEY HAD AND RECEIVED

104.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

105.     As is more fully set forth above, Defendant engaged in unfair and deceptive acts or practices in connection with their representation of an initial deposit match up to $600.

106.     As an intended and expected result of their conscious wrongdoing as set forth in this Amended Complaint, Defendant received payments from the Plaintiff and those similar situated for the use of Defendant's service.

107.     Defendant has voluntarily accepted and retained these payments with full knowledge and awareness that, as a result of their wrongdoing, Plaintiff and those similarly situated have deposited money under the pretense that their initial deposit would be doubled up to $600.

108.     The money had and received by the Defendant from the purchase of the services that are the subject of this action should not in justice be retained by the defendant, and should, in equity and good conscience be returned or paid back to the Plaintiff and those similarly situated.

109.     Plaintiff and those similarly situated are entitled in equity to seek restitution of Defendant's money had and received, to the extent and in the amount, deemed equitable and appropriate by the Court to remedy Defendant's unjust retention of the proceeds of any applicable sales, and such other relief as the Court deems just and proper.

## COUNT V:  DECEPTIVE PRACTICES IN VIOLATION OF STATE CONSUMER PROTECTION STATUTES

110.      Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

111.     Massachusetts prohibits "deceptive acts or practices in the conduct of any trade or commerce …."  M.G.L. c. 93A § 2.

112.    A person who has suffered a loss as a result of a violation of the Massachusetts Consumer Protection Act may recover actual damages, double or treble damages, plus attorney's fees and court costs.

113.    Defendant actions, as alleged herein, violate the Massachusetts Consumer Protection Act, M.G.L. c. 93A, § 2.

114.    Defendant's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

115.    The following states have consumer protection statutes that, like those of Massachusetts, prohibit deceptive acts or practices:

Alaska:  ALASKA STAT. § 45.50.471, *et seq*.

Arkansas:  ARK. CODE ANN. § 4-88-107, *et seq*.

California:  CAL. BUS. & PROF. CODE § 17200, *et seq*.

Colorado:  COLO. REV. STAT. § 6-1-101, *et seq*.

Connecticut:  CONN. GEN. STAT. § 42-110b, *et seq*.

Delaware: DEL. CODE ANN. Title 6, § 2511, *et seq*.

Hawaii:  HAW. REV. STAT. § 480, *et seq*.

Idaho:  IDAHO CODE § 48-601, *et seq*.

Indiana:  IND. CODE § 24-5-0.5-1, *et seq*.

Kansas:  KAN. STAT. § 50-623, *et seq*.

Kentucky:  KY REV. STAT. ANN. § 367.110, *et seq*.

Maine:  ME. REV. STAT. Tit. 5, § 205-A, *et seq*.

Maryland:  MD. CODE. ANN., COM. LAW § 13-101, *et seq*.

Michigan:  MICH. COMP. LAWS § 445.901, *et seq*.

Minnesota:  MINN. STAT. § 325F.68, *et seq.*

Nebraska: NEB. REV. STAT. § 59-1601, *et seq.*

Nevada:  NEV. REV. STAT. § 598.0903, *et seq.*

New Hampshire:  N.H. REV. STAT. ANN. § 358-A:1, *et seq.*

New Jersey:  N.J. STAT. ANN. § 56:8-1, *et seq.*

New Mexico:  N.M. STAT. ANN. § 57-12-1, *et seq.*

New York:  N.Y. EXEC. LAW § 63(12); N.Y. GEN. BUS. LAWS § 349(a), *et seq.*

North Carolina:  NC GEN. STAT. § 75-1.1, *et seq.*

North Dakota:  N.D. CENT. CODE § 51-15-01, *et seq.*

Ohio:  OHIO REV. CODE ANN. § 1345.01, *et seq.*

Oklahoma:  OKLA. STAT. Tit. 15, § 751, *et seq.*

Oregon:  OR. REV. STAT. § 646.605, *et seq.*

Pennsylvania: 73 PA. STAT. ANN. § 201-1, *et seq.*

Rhode Island: R.I. GEN. LAWS § 6-13.1-1, *et seq.*

South Dakota:  S.D. CODIFIED LAWS § 37-24-1, *et seq.*

Texas:  TEX. BUS. & COM. CODE ANN. § 17.41, *et seq.*

Utah:  UTAH CODE ANN. § 13-11-1 et seq.

Vermont:  VT. STAT. ANN. Tit. 9, § 2451, *et seq.*

Wisconsin:  WIS. STAT. § 100.20, *et seq.*

Wyoming:  WYO. STAT. ANN. § 40-12-101, *et seq.*

116.    The statutes identified in the preceding paragraph as well as M.G.L. c. 93A,

provide consumers with a private right of action for the Defendant's deceptive acts and practices.

117.    Defendant is engaged in trade and commerce.

29

118.    Defendant has engaged in deceptive acts or practices as alleged herein all conduct of which violates M.G.L. c. 93A and the statutes identified in paragraph 115 above.

119.    These deceptive acts and practices have been made unlawful under Massachusetts General Law c. 93A and similar or identical consumer protection and consumer fraud statutes in the other states set forth above.

120.    Defendant has engaged in the deceptive acts and practices as described above willfully and knowingly.

121.    Plaintiff has provided pre-suit notices and demands as required by M.G.L. c. 93A and any other applicable pre-suit notice or demand requirements set forth in the consumer protection and consumer fraud laws in the states set forth above.

122.    The Defendant's deceptive acts and practices have directly, foreseeably, and proximately caused or will cause damages and injury to Plaintiff and all others similarly situated, including class members.

123.    Plaintiff and all others similarly situated, including all class members, were injured and sustained ascertainable losses and damages in amounts to be proven at trial, as a direct and proximate result of Defendant's unfair, deceptive and unconscionable acts and practices as set alleged herein.

124.    By reason of the foregoing, Plaintiff and all others similarly situated, including all class members, are entitled to receive their actual damages, or statutory damages as applicable. Because Defendant acted willfully or knowingly, the Plaintiff and all others similarly situated, including all class members, are entitled to recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable under the consumer protection and consumer fraud statutes set forth above.

## COUNT VI:  UNFAIR/DECEPTIVE PRACTICES IN VIOLATION OF STATE CONSUMER PROTECTION STATUTES

125.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

126.    Massachusetts prohibits "[u]nfair … acts or practices in the conduct of any trade or commerce …."  M.G.L. c. 93A § 2.

127.    In outlawing unfair acts or practices, the Massachusetts Legislature adopted the FTC's interpretations of § 5(a)(1) of the Federal Trade Commission Act.  M.G.L. c. 93A § 2(b).

128.    The FTC considers "free" offers, such as Defendant's offers of "Free Bonus," "Free Offer," "100% First-Time Deposit Bonus" or "**DOUBLE YOUR CASH**" bonus to be deceptive and unfair if they do not set forth clearly and conspicuously at the outset of the offer all the terms, conditions and obligations upon which receipt and retention of the "Free" item are contingent.  16 C.F.R. § 251.1.

129.    As set forth above, DraftKings' practices violate the terms of 16 C.F.R. § 251.1 and therefore violate the M.G.L. c. 93A § 2.

130.    In determining whether a practice is unfair in violation of Section 5(a) of the FTC Act, the FTC also considers whether the practice is unethical, and, accordingly, so does Illinois courts in determining whether a practice is unfair in violation of the M.G.L. c. 93A § 2.

131.    Defendant's actions are unethical and unfair for the following reasons:

- DraftKings' large-type representations of the offer of a "Free Bonus," "Free Offer," "100% First-Time Deposit Bonus" and "**DOUBLE YOUR CASH**" bonus do not contain simple and consistent statements or representations of all the essential points of the offer, and the overall impression of the "bonus" offer is contradicted by the small-print disclaimers in a footnote and on a separate "FAQ" page.

- The representations in the footnote and on the "FAQ" page are by their size, placement, and other characteristics unlikely to be noticed and difficult to understand even though they are material to the offer.

31

- The representations of a "100% First-Time Deposit Bonus" and "**DOUBLE YOUR CASH**" bonus are similar to "free," "2-for-1," or "half-price" representations but have qualifications and conditions that are not clearly and conspicuously disclosed in close conjunction with the representations. Moreover, to obtain the "100% First-Time Deposit Bonus" or doubling of cash the consumer has pay a higher price than represented.

132.    A person who has suffered a loss as a result of a violation of the Massachusetts

Consumer Protection Act may recover actual damages, double or treble damages, plus attorney's

fees and court costs.

133.    Defendant actions, as alleged herein, violate the Massachusetts Consumer

Protection Act, M.G.L. c. 93A, § 2.

134.    Defendant's actions, as alleged herein, were performed intentionally, willfully,

knowingly, and maliciously.

135.    The following states have consumer protection statutes that, like those of

Massachusetts, prohibit unfair or unconscionable acts or practices:

Arkansas:  ARK. CODE ANN. § 4-88-107, *et seq*.

California:  CAL. BUS. & PROF. CODE § 17200, *et seq*.

Connecticut:  CONN. GEN. STAT. § 42-110b, *et seq*.

Delaware:  DEL. CODE ANN. Title 6, § 2511, *et seq*.

Hawaii:  HAW. REV. STAT. § 480, *et seq*.

Idaho:  IDAHO CODE § 48-601, *et seq*.

Kansas:  KAN. STAT. § 50-623, *et seq*.

Maine:  ME. REV. STAT. Tit. 5, § 205-A, *et seq*.

Maryland:  MD. CODE. ANN., COM. LAW § 13-101, *et seq*.

Nebraska:  NEB. REV. STAT. § 59-1601, *et seq*.

New Hampshire:  N.H. REV. STAT. ANN. § 358-A:1, *et seq*.

New Jersey:  N.J. STAT. ANN. § 56:8-1, *et seq.*

New Mexico:  N.M. STAT. ANN. § 57-12-1, *et seq.*

North Carolina:  NC GEN. STAT. § 75-1.1, *et seq.*

Oklahoma:  OKLA. STAT. Tit. 15, § 751, *et seq.*

Oregon:  OR. REV. STAT. § 646.605, *et seq.*

Rhode Island:  R.I. GEN. LAWS § 6-13.1-1, *et seq.*

Texas:  TEX. BUS. & COM. CODE ANN. § 17.41, *et seq.*

Vermont:  VT. STAT. ANN. Tit. 9, § 2451, *et seq.*

Wyoming:  WYO. STAT. ANN. § 40-12-101, *et seq.*

136.    The statutes identified in the preceding paragraph as well as M.G.L. c. 93A,
provide consumers with a private right of action for the Defendant's unfair and/or
unconscionable acts and practices.

137.    Defendant is engaged in trade and commerce.

138.    Defendant has engaged in unfair and unconscionable acts or practices as alleged
herein all conduct of which violate M.G.L. c. 93A and the statutes identified in paragraph 135
above.

139.    These unfair acts and practices have been made unlawful under Massachusetts
General Law c. 93A and similar or identical consumer protection and consumer fraud statutes in
the other states set forth above.

140.    Defendant has engaged in the unfair and unconscionable acts and practices as
described above willfully and knowingly.

141.     Plaintiff has provided pre-suit notices and demands as required by M.G.L. c. 93A and any other applicable pre-suit notice or demand requirements set forth in the consumer protection and consumer fraud laws in the states set forth above.

142.     The Defendant's unfair and unconscionable acts and practices have directly, foreseeably, and proximately caused or will cause damages and injury to Plaintiff and all others similarly situated, including class members.

143.     Plaintiff and all others similarly situated, including all class members, were injured and sustained ascertainable losses and damages in amounts to be proven at trial, as a direct and proximate result of Defendant's unfair and unconscionable acts and practices as set alleged herein.

144.     By reason of the foregoing, Plaintiff and all others similarly situated, including all class members, are entitled to receive their actual damages, or statutory damages as applicable. Because Defendant acted willfully or knowingly, the Plaintiff and all others similarly situated, including all class members, are entitled to recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable under the consumer protection and consumer fraud statutes set forth above.

## COUNT VII:  DECLARATORY RELIEF REGARDING DEFENDANT'S SO-CALLED "TERMS OF USE"

145.     Plaintiffs hereby incorporate by reference the preceding allegations as if fully set forth herein.

146.     As set forth above, Defendant's DraftKings website contains so-called "Terms of Use" that purport to eliminate all liability of Defendant for any violations of the law whatsoever.

147.     These so-called "Terms of Use" also purport to require that any claim or dispute

be heard in a non-class arbitration in Suffolk Massachusetts and also that it be "decided

exclusively by a court of competent jurisdiction in Suffolk County, Massachusetts."

148.     These so-called "Terms of Use" are not part of a binding, mutual agreement

between Plaintiff and Defendant and are unenforceable as unconscionable.

149.     Any agreement set forth in the so-called "Terms of Use" is illusory for the

following reasons:

150.     The so-called "Terms of Use" purport to provide that the user releases DraftKings

"from any and all liability, claims or actions of any kind whatsoever."  As a result, DraftKings

has not agreed to do anything and any agreement by the user is without consideration.

151.     DraftKings reserves for itself and itself alone the right to revoke all rights granted

to the users of the draftkings.com website without prior notice.  Just as with the provision

described in the immediately preceding paragraph, as a result, DraftKings has not agreed to do

anything and any agreement by the user is without consideration.

152.     DraftKings reserves for itself and itself alone the right to amend the so-called

"Terms of Use" at any time without prior notice and purports to require that it is the

responsibility of the user the "to review these Terms of Use for any changes."  Considering the

length and complexity of the purported "Terms of Use," it would be virtually impossible, if not

actually impossible, for a user of the site to review the purported "Terms of Use" every time the

user accessed the site, see whether the page indicates that it has been updated since his or her

previous viewing and, if so, compare it to the previous version (assuming the user could even

find the previous version, which is not on the website) to determine which words or statements

had been changed.  As a result, DraftKings has a unilateral right to amend whatever agreement the so-called "Terms of Use" represent.

153.    DraftKings reserves the right to deny service to any user "for any reason whatsoever."  As a result, the consumer does not receive any consideration for his or her agreement.

154.    Important terms, such as the waiver of liability, the class waiver, the arbitration provision, the forum and choice-of-law provisions and the cost-shifting provision are hidden in a maze of fine print and are therefore difficult to find.

155.    The above provisions are difficult for an average consumer to understand.

156.    DraftKings is in a superior bargaining position to the consumers who wish to use the site.

157.    The so-called "Terms of Use" are non-negotiable.

158.    The so-called "Terms of Use" contain unexplained contradictions, are therefore nonsensical, and accordingly do not constitute a meeting of the minds.  Such contradictions include the following:

159.    At one place, they claim that DraftKings' "Terms of Use," Privacy Policy and Rules of the Contest constitute the agreement; at another they claim that the "Terms of Use" by themselves constitute the agreement.

160.    At one place, they claim that any claim or dispute must be resolved in an individual arbitration proceeding; at another that any claim or dispute must be resolved in a court of competent jurisdiction.

161.    The so-called "Terms of Use" are so one-sided in DraftKings' favor as to oppress or unfairly surprise consumers, and result in an overall imbalance in the obligations and rights imposed on and provided to the parties.

162.    A consumer is not given the opportunity to attempt to negotiate the terms of the purported "Terms of Use."

163.    WHEREFORE, Plaintiffs respectfully request that the Court enter a Declaratory Judgment that DraftKings' so-called "Terms of Use" do not constitute a binding agreement, are unconscionable and void, and are an illusory agreement.

## JURY TRIAL DEMAND

164.    Plaintiff, individually and on behalf of the putative Class described herein, hereby demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff in his own capacity and on behalf of the putative Class, hereby respectfully petition this Honorable Court for the following relief:

1.    Certification of the Class as requested herein;

2.    Entering an order appointing DeMoura|Smith LLP, Perini-Hegarty & Associates, P.C., Law Office of Richard S. Cornfeld and Leritz, Plunkert & Bruning, P.C. as lead counsel for the Class;

3.    Money damages in the amounts of the "Free Bonus," "Free Offer," "100% First-Time Deposit Bonus" and "**DOUBLE YOUR CASH**" bonus that Plaintiff and Class Members did not receive upon making their initial deposits;

4.    Money damages, including double or treble damages and attorneys' fees as permitted by law, under the claims asserted in Count V of this Amended Complaint.

5.      Pre- and post-judgment costs and interests, as authorized by law;

6.      Reasonable attorneys' fees and costs; and

7.      Such other and further relief as this Court may deem just and proper.

Respectfully submitted,

By:    */s/ Kenneth J. DeMoura*
      Kenneth J. DeMoura
      BBO#: 548910
      DEMOURA|SMITH LLP
      One International Place, 14th Floor
      Boston, MA 02110
      Office: 617.535.7531
      kdemoura@demourasmith.com

and

By:    */s/ Emily Lisa Perini*
      Emily Lisa Perini
      BBO #: 684103
      PERINI-HEGARTY & ASSOCIATES, P.C.
      225 Franklin Street, 26th Floor
      Boston, MA 02110
      617.217.2832
      elp@perinihegartypc.com
      *Attorneys for Plaintiff*

Dated:  August 5, 2015

And Entered *Pro Hac Vice*:

Richard S. Cornfeld
LAW OFFICE OF RICHARD S. CORNFELD
1010 Market Street, Suite 1720
St. Louis, MO  63101
P. 314-241-5799 / F. 314-241-5788
rcornfeld@cornfeldlegal.com

and

Anthony S. Bruning,
Anthony S. Bruning, Jr.
LERITZ, PLUNKERT & BRUNING, P.C.
555 Washington Avenue, Suite 600
St. Louis, MO 63101
P. 314-231-9600 / F. 314-231-9480
abruning@leritzlaw.com
ajbruning@leritzlaw.com

**Attorneys for Plaintiff**